213 P.3d 320

**Sylvia L. CANNON, Plaintiff/Appellant,**

v.

**HIRSCH LAW OFFICE, P.C.; Lawrence D. Hirsch; Iva S. Hirsch, Defendants/Appellees.**

**No. 1 CA–CV 08–0283.**

Court of Appeals of Arizona, Division 1, Department A.

July 14, 2009.

Sylvia L. Cannon, Plaintiff/Appellant, Wickenburg, In Propria Persona.

Hinshaw & Culbertson, LLP by Victoria L. Orze, Phoenix, Attorneys for Defendants/Appellees.

## OPINION

BARKER, Judge.

¶ 1 Appellant Sylvia Cannon ("Cannon") appeals the trial court's decision to grant summary judgment in favor of Lawrence Hirsch ("Hirsch"). The trial court found that Cannon's legal malpractice claim was barred by the two-year statute of limitations. For the reasons that follow, we find that genuine issues of material fact preclude summary judgment on the issue of whether Cannon's malpractice claim was filed before the two-year statute of limitations had run, and thus we reverse and remand.

### *Facts and Procedural History*

¶ 2 In May 2004 Cannon retained Hirsch to protect her interests as a creditor in a Chapter 13 bankruptcy action filed by Angele and Gwin Vaughn ("Vaughns"). Cannon had loaned the Vaughns money for their printing business, which was evidenced by a note secured by an equipment lien (hereinafter "Note"). The Note was secured by printing equipment, office equipment, and other items used in the Vaughns' business. Cannon gave Hirsch a copy of the Note as well as a list of the equipment intended to secure the Note. Hirsch attended the meeting of creditors on Cannon's behalf. He also filed a stipulation for relief from the automatic stay in the bankruptcy court, which memorialized an agreement among Cannon, the Vaughns, and the bankruptcy trustee to allow Cannon to foreclose upon her secured collateral.

¶ 3 Hirsch then engaged Arizona Auctioneers to retrieve the equipment and sell it at public auction. Arizona Auctioneers sold the printing equipment at a public auction on September 30, 2004. The company then sent Hirsch a $956.04 check, payable to Cannon, for the net proceeds of the sale. On October 25, 2004, Hirsch sent Cannon a letter that explained the breakdown of the proceeds of the auction, and he enclosed the $956.04 check he had received on her behalf from Arizona Auctioneers. On November 4, 2004,

Hirsch spoke with Cannon regarding the completed auction and sale of equipment. On November 5, 2004, Hirsch sent Cannon another follow-up letter about the sale, attaching a copy of the newspaper ads noticing the sale and documentation of the expenses attendant to the sale.

¶ 4 During this same period, the Vaughns' Chapter 13 bankruptcy case was converted to a case under Chapter 7. A meeting of creditors on the Chapter 7 petition was held on October 25, 2004. The deadline to file a complaint objecting to discharge of the debtor expired on December 27, 2004. The Vaughns were granted a discharge on January 4, 2005.

¶ 5 Cannon filed a complaint in superior court on January 3, 2007, alleging legal malpractice, among other claims. In particular, Cannon claimed that Hirsch did not properly represent her as a creditor in the Vaughns' bankruptcy proceedings. Hirsch filed a motion for summary judgment. Cannon responded to the motion but did not file a separate or controverting statement of facts. The trial court granted Hirsch's motion, finding that Cannon's malpractice claim was barred by the two-year statute of limitations. In making this ruling, the trial court made a preliminary finding that the alleged malpractice did not occur "during the course of litigation" and thus her cause of action accrued when she found out about the sale of the printing equipment in November of 2004.

¶ 6 Cannon filed a premature notice of appeal on April 2, 2008. A signed final judgment was entered on April 21, 2008. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101 (2003).[1]

### *Discussion*

¶ 7 Summary judgment may be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(c)(1). We review a summary judgment *de novo* to determine whether any genuine issues of material fact exist and whether the court properly applied the law. *Eller Media Co. v. City of Tucson*, 198 Ariz. 127, 130, ¶ 4, 7 P.3d 136, 139 (App.2000). In reviewing a grant of summary judgment, we view the evidence and reasonable inferences "in the light most favorable to the party opposing the motion." *Wells Fargo Bank v. Ariz. Laborers Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 482, ¶ 13, 38 P.3d 12, 20 (2002).

¶ 8 Cannon argues that the trial court misapplied the law by finding that she had not timely filed her malpractice claim. In Arizona, legal malpractice claims are governed by the statute of limitations set forth in A.R.S. § 12–542 (2003), which provides that such claims must be brought "within two years after the cause of action accrues." *See also Commercial Union Ins. Co. v. Lewis & Roca*, 183 Ariz. 250, 254, 902 P.2d 1354, 1358 (App.1995) (holding that the statute of limitations for a legal malpractice action "begins to run when a cause of action accrues"). Arizona follows the "discovery rule" in determining the date the cause of action for a legal malpractice claim accrues. *Id.* ("The determination of when a cause of action accrues on a claim for legal malpractice is governed by the discovery rule."). "Traditionally stated, this rule provides that a claim for attorney negligence cannot accrue until the client knows or should know of his attorney's negligent conduct." *Id.; see also Kiley v. Jennings, Strouss & Salmon*, 187 Ariz. 136, 139, 927 P.2d 796, 799 (App.1996) ("A claim for legal malpractice accrues when: (1) the plaintiff knows or reasonably should know of the attorney's negligent conduct; and (2) the plaintiff's damages are ascertainable, and not speculative or contingent.").

¶ 9 When the alleged malpractice occurs during the course of litigation, however, Arizona courts have held that the "injury or damaging effect on the unsuccessful party is not ascertainable until the appellate process is completed or is waived by a failure to appeal." *Amfac Distrib. Corp. v. Miller* (*Amfac II*), 138 Ariz. 152, 154, 673 P.2d 792, 794 (1983). Consequently, "[i]t is only in the

---

1. Although Cannon prematurely filed her appeal, jurisdiction is proper when, as here, a premature notice of appeal is followed by entry of an appealable judgment. *See Schwab v. Ames Constr.*, 207 Ariz. 56, 58, ¶ 9, 83 P.3d 56, 58 (App.2004).

context of litigation ... that accrual of the cause of action is deferred until the litigation in which the malpractice arose is finally resolved." *Commercial Union Ins. Co.*, 183 Ariz. at 256, 902 P.2d at 1360.

¶ 10 On appeal, Cannon claims that Hirsch's negligent representation of her as a creditor in a Chapter 7 bankruptcy proceeding constituted malpractice "during the course of litigation" as described in *Amfac* and the related cases. As such, she contends, the cause of action did not accrue, and the statute of limitations begin to run, until at least January 4, 2005, when the notice of discharge was filed. Accordingly, we turn to the question of whether the alleged error occurred "during the course of litigation." To determine whether the trial court properly applied the law in finding that Cannon's malpractice claim accrued before the January 4, 2004 notice of discharge, we must make a preliminary determination of whether Hirsch's alleged malpractice occurred "during the course of litigation."

### 1. Malpractice "During the Course of Litigation"

¶ 11 To properly address Cannon's claim, we first review the relevant Arizona cases addressing this issue. As those cases do not resolve whether a non-adversarial bankruptcy proceeding constitutes "litigation" for purposes of the accrual of an attorney malpractice claim, we turn to other definitions of the term "litigation." We then examine the nature of a bankruptcy proceeding in general and determine whether it falls within the ambit of our definition of "litigation." Lastly, we will analyze the facts of this case and determine whether Hirsch represented Cannon in a litigation matter.

#### a. The Arizona Cases

¶ 12 In *Amfac*, an attorney represented a client in a civil action against a subcontractor. *Amfac Distrib. Corp. v. Miller (Amfac I)*, 138 Ariz. 155, 155, 673 P.2d 795, 795 (App.1983). The alleged malpractice occurred when the attorney failed to name the proper party. *Id.* The trial court dismissed the case. *Id.* The client filed an appeal, but the ruling was affirmed by our supreme

court. *Id.; Amfac II*, 138 Ariz. at 153, 673 P.2d at 793. The client then filed a legal malpractice claim against the negligent attorney. *Amfac I*, 138 Ariz. at 155, 673 P.2d at 795. The trial court in the malpractice action granted summary judgment in the attorney's favor, finding that the client's claim was barred by the statute of limitations because it was filed more than two years after the client's underlying lawsuit was dismissed in the trial court. *Id.* at 156, 673 P.2d at 796. On appeal, we held that the malpractice action did not accrue until the underlying litigation was finally adjudicated on appeal because the client might nevertheless prevail on appeal and ultimately suffer no damages. *Id.* at 156–59, 673 P.2d at 796–99. In *Amfac II*, our supreme court approved the holding in *Amfac I* that "a cause of action for legal malpractice occurring in the course of litigation accrues when the plaintiff knew or should reasonably have known of the malpractice and when the plaintiff's damages are certain and not contingent upon the outcome of an appeal." 138 Ariz. at 153, 673 P.2d at 793.

¶ 13 *Amfac* was then interpreted in *Tullar v. Walter L. Henderson, P.C.*, 168 Ariz. 577, 816 P.2d 234 (App.1991). In *Tullar*, the malpractice occurred when the Tullars hired an attorney to review their sales documents and assist with their closing, and the attorney failed to ensure that a note for the purchase was secured. *Id.* at 578, 816 P.2d at 235. Although the *Tullar* malpractice did not occur in litigation as in *Amfac*, the cause of action was held not to have accrued in *Tullar* upon the failure to obtain the security, or even upon default, but rather when the note became uncollectible, because only then was the client's loss certain. *Id.* at 578–79, 816 P.2d at 236–37. Though *Tullar* does not assist us in determining whether an uncontested bankruptcy action is "litigation" for purposes of extending the accrual date of a malpractice action, it stands for the related proposition that under at least some circumstances a malpractice action may not accrue if the alleged negligence upon which it is based may still be cured.

¶ 14 *Amfac* was next interpreted in *Lansford v. Harris*, a malpractice case related to

bankruptcy litigation. 174 Ariz. 413, 415, 850 P.2d 126, 128 (App.1992). In *Lansford,* the debtor-plaintiff claimed that her bankruptcy litigation attorney neglected to properly represent her in litigation related to the dischargeability of a debt. *Id.* On appeal, applying *Amfac I* and *II,* we held that a malpractice action did not accrue until the underlying bankruptcy litigation was resolved on appeal. *Id.* at 418, 850 P.2d at 131. This case is closest to the factual circumstances we have here, yet not precisely on point.

¶ 15 As we discuss in more detail below, bankruptcy proceedings may contain both an "adversarial" portion and a "non-adversarial" portion. *Infra* ¶¶ 21–24. The adversarial portion begins not when a *debtor* files the bankruptcy action but when a *creditor* files a separate complaint contesting the discharge of a debt. *Infra* ¶¶ 22–23. In *Lansford,* the alleged malpractice occurred in the portion of a bankruptcy action that was clearly contested. As we noted there, the attorney alleged to have committed malpractice "represented the Lansfords in litigation concerning the dischargeability of a debt in bankruptcy. In that litigation, the court ruled that the Lansfords' debt to [a creditor] was nondischargeable as to both Mr. and Mrs. Lansford." *Lansford,* 174 Ariz. at 415, 850 P.2d at 128. The only way that there could have been litigation over a specific debt is for the creditor's counsel to have initiated adversary proceedings by filing a complaint. *See* Fed. R. Bankr.P. 7003. In our case, the bankruptcy matter was concluded without any adversarial proceedings being conducted.

¶ 16 Subsequently, in *Commercial Union Insurance Co. v. Lewis and Roca,* we further refined the *Amfac/Lansford* rule, stating that "it is only in the context of litigation … that accrual of the cause of action is deferred until the litigation in which the malpractice arose is finally resolved." 183 Ariz. at 256, 902 P.2d at 1360. We thus continued to carve out a distinction between "litigation-related malpractice" and "non-litigation-related malpractice."

¶ 17 This distinction is highlighted in two subsequent cases from our court. In *Environmental Liners, Inc. v. Ryley, Carlock, and Applewhite,* we found that the recording

of a mining lien was outside the scope of litigation and specifically declined to hold that the cause of action did not accrue until the conclusion of separate, bankruptcy litigation that arose after the alleged negligence— even though the litigation would clearly affect the potential damages arising from the alleged negligent transaction. 187 Ariz. 379, 384–85, 930 P.2d 456, 461–62 (App.1996). Similarly, in *Keonjian v. Olcott,* we found that an attorney's alleged malpractice occurred outside the scope of litigation. 216 Ariz. 563, 566, ¶ 12, 169 P.3d 927, 930 (App. 2007). In that case, when preparing a client's deed, the attorney gave the client a lesser interest, and her daughter a greater interest, than the client had intended. *Id.* at 564, ¶ 2, 169 P.3d at 927. The client sued her daughter to rectify the situation. *Id.* at ¶ 4. The lawsuit between the client and her daughter was resolved by a settlement agreement. *Id.* After the settlement, the client sued the drafting attorney for malpractice. *Id.* at ¶ 5. We found that the client's malpractice action was untimely, stating that the client "became aware or should have been aware of the cause of [her] harm" on the date when she filed the lawsuit against her daughter, not on the date that the client-daughter lawsuit was resolved. *Id.* at 566, ¶ 14, 169 P.3d at 930.

¶ 18 In *Althaus v. Cornelio,* we additionally interpreted *Amfac* in the context of lawsuit settlements. 203 Ariz. 597, 58 P.3d 973 (App.2002). In finding that genuine issues of material fact precluded summary judgment, we held that "*Amfac's* final judgment rule does not necessarily control a malpractice case … in which the underlying case has been settled." *Id.* at 600, ¶ 14, 58 P.3d at 976. We further stated:

[W]hen the underlying case is not settled, a malpractice plaintiff's injury or damages may not be fully "ascertainable until the appellate process is completed or is waived by a failure to appeal." But that concern evaporates when a settlement of the underlying case effectively waives any appeal therein and, thus, eliminates any possibility of the malpractice damages changing. In other words, when the underlying case is settled, there is no prospect of "success-

ful prosecution of an appeal [in that case] and ultimate vindication of the attorney's conduct by an appellate court."

Moreover, in a nonsettlement context, it generally "is only when the litigation is terminated and the client's rights are 'fixed' that it can safely be said that the lawyer's misdeeds resulted in injury to the client." In a case such as this, however, a trier of fact might find that a binding and enforceable oral settlement of the underlying case " 'fixed' " the client's rights and immediately "resulted in injury to the client," notwithstanding the need for future documents, filings, procedures, and even bankruptcy court approval to finalize the settlement.

*Id.* at ¶¶ 11–12 (citations omitted). Thus, while our cases since *Amfac* address the broad parameter of when an alleged error occurs within litigation, they do not provide a detailed definition of "litigation" that enables us to discern whether a non-adversarial bankruptcy proceeding falls within that term. Accordingly, we turn to additional authorities for guidance.

### b. Definitions of Litigation

¶ 19 Because the Arizona cases discussing accrual do not define the term "litigation," we may turn to dictionaries to assist us. *State v. Mahaney*, 193 Ariz. 566, 568, ¶ 12, 975 P.2d 156, 158 (App.1999) ("In determining the ordinary meaning of a word, we may refer to an established and widely used dictionary."). "Litigation" generally is defined as "[a] lawsuit. Legal action, including all proceedings therein.... A judicial contest, a judicial controversy." Black's Law Dictionary 645 (6th ed.1991). A "lawsuit" is a "vernacular term for a suit," which has been characterized as "an *adversarial* proceeding." *Id.* at 614, 975 P.2d 156; *In re Barrett Ref. Corp.*, 221 B.R. 795, 803 (Bankr. W.D.Okla.1998) (emphasis added). To "contest" something means "[t]o assert a defense to an *adverse* claim in a court proceeding." Black's Law Dictionary, *supra*, at 222 (emphasis added). A "controversy" is an *"adversary* proceeding in a court of law." *Id.* at 230 (emphasis added). In other contexts, courts have defined "litigation" to include "civil and criminal trial proceedings, as well

as *adversarial* proceedings before an administrative agency, an arbitration panel or a claims commission, and alternative-dispute-resolution proceedings such as mediation or mini-trial." Restatement (Third) of The Law Governing Lawyers § 87 cmt. h (2000) (defining litigation in the work-product immunity context) (emphasis added).

¶ 20 As these definitions make clear, the hallmark feature of "litigation" is its adversarial nature. Adversary proceedings are characterized as ones "having opposing parties" and that are "contested, as distinguished from an ex parte hearing or proceeding." Black's Law Dictionary, *supra*, at 34. Commentators have stated that "a proceeding is adversarial when evidence or legal argument is presented by parties contending against each other with respect to legally significant factual issues." Restatement (Third) of The Law Governing Lawyers § 87 cmt. h (2000). One court defined "litigation" to include "all trial-type hearings, proceedings in which a trial-type hearing may be had of right even if no such hearing is actually held, rule-making on the record, and any other proceedings in which by law or established practice the right of cross-examination exists." *United States v. Am. Tel. & Tel. Co.*, 86 F.R.D. 603, 628 (D.D.C.1979). Other courts have defined "suit" (which, as noted above, is included in the definition of "litigation") as:

> 1) an adversarial proceeding, 2) which arises as a result of a deprivation or injury, 3) which involves at least two parties, 4) which compels the attendance of the parties, 5) which asserts and prosecutes a claim against one of the parties, and 6) which demands the restoration of something from the defending party.

*In re Barrett Ref. Corp.*, 221 B.R. at 803.

### c. Bankruptcy Proceedings

¶ 21 We note from the outset that it is clear, based on *Lansford*, that a *contested* bankruptcy matter qualifies as litigation for purposes of applying the *Amfac* accrual rule. *Supra* ¶¶ 14–15. To properly analyze whether the representation of a creditor in non-adversarial bankruptcy proceedings consti-

tutes "litigation," we must examine the general nature and procedures involved in bankruptcy proceedings and compare them with the types of procedures considered "adversarial" in the authorities cited above. A recent United States Supreme Court case summarized Chapter 7 bankruptcy proceedings as follows:

> In a typical voluntary bankruptcy proceeding under Chapter 7, the debtor files a petition for bankruptcy in which he lists his debts or his creditors; the petition constitutes an order for relief. The court clerk notifies the debtor's creditors of the order for relief, and if a creditor wishes to participate in the debtor's assets, he files a proof of claim. If a creditor chooses not to submit a proof of claim, once the debts are discharged, the creditor will be unable to collect on his unsecured loans. The discharge order releases a debtor from personal liability with respect to any discharged debt by voiding any past or future judgments on the debt and by operating as an injunction to prohibit creditors from attempting to collect or to recover the debt.

*Tenn. Student Assistance Corp. v. Hood,* 541 U.S. 440, 447, 124 S.Ct. 1905, 158 L.Ed.2d 764 (2004).

¶ 22 The initial voluntary filing by a debtor is a proceeding "against the world" that determines "all claims that anyone, whether named in the action or not, has to the property or thing in question." *Id.* at 448, 124 S.Ct. 1905 (internal quotation marks and citation omitted). It differs from traditional civil litigation in that the opposing parties (creditors) "generally are not entitled to personal service before a bankruptcy court may discharge a debt." *Id.* at 451, 124 S.Ct. 1905.

¶ 23 Other authorities clarify the hybrid nature of bankruptcy proceedings by expounding upon their respective adversarial and non-adversarial components:

> [A] bankruptcy case is not an adversarial proceeding. Instead, it is a request by a single party to discharge or rearrange debts. This stance is highlighted by the style of a bankruptcy case: *"In re John Debtor."* A bankruptcy case is not styled *"John Debtor v. Jane Creditor."* Further, *a bankruptcy case does not, as a matter of parties of record, involve two or more adversarial parties, unless a debtor, creditor, or trustee initiates a complaint within the bankruptcy case.* In such an instance, this adversary proceeding is dependent on the bankruptcy case and is not an independent cause of action. Further, a bankruptcy case, itself, is not prompted by a deprivation or injury by an opposing party.
>
> Also, in a bankruptcy case, the only party required to attend is the debtor. Creditors are not compelled to attend. Notice is given to the creditors but they are free to ignore the case.
>
> Finally, a petition commencing a bankruptcy case does not assert or prosecute a claim against any other party. The debtor does not demand the presence of other parties to adjudicate a claim. Nor does the debtor, by the petition, "sue" anyone or demand the restoration of some thing from an opposing party.

*In re Barrett Ref. Corp.,* 221 B.R. at 803 (finding that bankruptcy proceedings do not meet the definition of "suit" for Eleventh Amendment purposes) (emphasis added) (footnote omitted). Thus, we see that it is only when a creditor files a complaint that a bankruptcy proceeding becomes an adversarial proceeding. The bankruptcy court went on to further explain that

> [t]here is a significant difference between a bankruptcy case and an adversary proceeding within a bankruptcy case. An adversary proceeding is a civil proceeding arising in or relating to a bankruptcy case. The adversary proceeding often involves the recovery of property or the determination of the value of property and has adversarial parties. However, the adversary proceeding is related to and dependent on the bankruptcy case and cannot occur unless a bankruptcy case has been filed. *Indeed, in many bankruptcy cases, adversary proceedings do not occur.*

*Id.* at 803 n. 10 (emphasis added) (citations omitted).

■ ¶ 24 The above cases make it clear that a bankruptcy proceeding in which a creditor fails to file a complaint objecting to

the discharge of the debtor does not have the adversarial characteristics of "litigation." On the other hand, once a creditor has filed a complaint objecting to the discharge of the debtor, the proceedings take on an adversarial nature [2] and thus constitute "litigation" for the purposes of determining when a legal malpractice cause of action accrues. *See Lansford,* 174 Ariz. at 415–18, 850 P.2d at 128–31 (rejecting the assertion that the plaintiff's malpractice action was barred by the statute of limitations and holding instead that the plaintiff's claim had not accrued until the underlying adversary bankruptcy litigation was resolved on appeal).

### d. Whether Hirsch's Alleged Malpractice Occurred "During the Course of Litigation"

¶ 25 Though *Lansford* squarely addresses adversary proceedings in a bankruptcy matter, the issue before us is whether the non-adversarial portions of a bankruptcy action constitute "litigation" for the purposes of determining when a legal malpractice cause of action accrues. As noted above, there is a stark contrast between the non-adversarial and adversarial portions of bankruptcy proceedings. There is a bright-line test to distinguish between the non-adversarial and adversarial portions of a bankruptcy proceeding: adversarial proceedings begin when a creditor files a complaint in a bank-

ruptcy action. *See* Fed. R. Bankr.P. 7003.[3] Because this distinction is clear, and because the nature of bankruptcy proceedings before a complaint is filed is non-adversarial, we hold that an attorney's alleged negligence while representing a creditor in the non-adversarial portions of bankruptcy proceedings does not occur in the course of "litigation," as that term is used for purposes of the accrual of an attorney malpractice action.

¶ 26 Hirsch's alleged negligence committed while representing Cannon in the Vaughns' bankruptcy proceedings did not occur in the course of litigation, as no "litigation," as that term is utilized for purposes of *Amfac,* was initiated. Accordingly, Cannon is unable to avail herself of *Amfac's* rule that the accrual of a cause of action against a lawyer does not take place until litigation is completed.

¶ 27 Our specially concurring colleague suggests that the distinction we make between adversarial and non-adversarial proceedings in a bankruptcy case is "hypertechnical." *Infra* ¶ 39. To the contrary, this distinction goes to the very heart of the "course of litigation" exception. The purpose of the "course of litigation" exception is to provide for the alleged malpractice to be cured by subsequent action in the litigation. *Supra* ¶¶ 9, 12–18; *Amfac I,* 138 Ariz. at 156,

**2.** In comparing the adversary proceedings in bankruptcy court to those in federal civil litigation, Justice Thomas noted:

> The similarities between adversary proceedings in bankruptcy and federal civil litigation are striking. Indeed, the Federal Rules of Civil Procedure govern adversary proceedings in substantial part. The proceedings are commenced by the filing of a complaint, Fed. Bkrtcy. Proc. 7003; process is served, Rule 7005; the opposing party is required to file an answer, Rule 7007; and the opposing party can file counterclaims against the movant, Rule 7013. Federal Rule of Civil Procedure 8 applies to the parties' pleadings. Fed. Rule Bkrtcy. Proc. 7008. Even the form of the parties' pleadings must comply with the federal rules for civil litigation. Rule 7010. "Likewise, discovery in [adversary proceedings] largely mirrors discovery in federal civil litigation." *Federal Maritime Comm'n [v. S.C. State Ports Auth.,* 535 U.S. 743, 758, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002)]. *See* Fed. Rules Bkrtcy. Proc. 7026–7037 (applying Fed. Rules

Civ. Proc. 26–37 to adversary proceedings). And, when a party fails to answer or appear in an adversary proceeding, the Federal Rule governing default judgments applies. Fed. Rule Bkrtcy. Proc. 7055 (adopting Fed. Rule Civ. Proc. 55).

*Hood,* 541 U.S. at 457–58[, 124 S.Ct. 1905] (Thomas, J., dissenting).

**3.** The "Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines" issued by the court in the Vaughns' bankruptcy case even states:

> If you believe that the debtor is not entitled to receive a discharge under Bankruptcy Code § 727(a) *or* that a debt owed to you is not dischargeable under Bankruptcy Code § 523(a)(2), (4), (6), or (15), *you must start a lawsuit by filing a complaint* in the bankruptcy clerk's office by the "Deadline to File a Complaint Objecting to Discharge of the Debtor or to Determine Dischargeability of Certain Debts" listed on the front side.

(Second emphasis added.)

673 P.2d at 796 ("Apparent damage may vanish with successful prosecution of an appeal and ultimate vindication of the attorney's conduct by an appellate court."); *see Amfac II*, 138 Ariz. at 153, 673 P.2d at 793 (stating that a cause of action for legal malpractice occurring in the course of litigation accrues "when the plaintiff knew or should reasonably have known of the malpractice and when the plaintiff's damages are certain and *not contingent upon the outcome of an appeal.*" (quoting *Amfac I*, 138 Ariz. at 156, 673 P.2d at 796 (emphasis added) ) ).

¶ 28 This purpose does not apply to non-adversarial proceedings. Here, for example, Hirsch's failure to file an objection to initiate an adversarial proceeding was essentially the same as missing a statute of limitation that would initiate a civil action. *See In re Santos*, 112 B.R. 1001, 1005–07 (B.A.P. 9th Cir. 1990) (finding that the time period to comply with the sixty-day objection period under [Bankruptcy] Rules 4004 and 4007 is the "equivalent of a statute of limitations"); *see also in re Walgamuth*, 144 B.R. 465, 467 (Bankr.D.S.D.1992) (stating that the deadline to object is "strictly enforced"). Thus, no subsequent action in the bankruptcy proceeding could result in the "ultimate vindication of the attorney's conduct." *Amfac I*, 138 Ariz. at 156, 673 P.2d at 796; *see also Althaus*, 203 Ariz. at 600, ¶ 11, 58 P.3d at 976 (same). The purposes underlying the "course of litigation" exception are not present. The same rationale applies to other alleged malpractice in a non-adversarial proceeding.

¶ 29 If we treated the failure to meet a filing deadline for an adversarial proceeding as a "course of litigation" exception, and some other creditor had filed an adversarial proceeding, then the statute would not begin to run against such a lawyer until the proceeding involving the other lawyer (including appeals) had concluded. The lawyer would thus be exposed to the prospect of a malpractice claim for a substantially longer period of time, even though there was no prospect that the litigation would affect his conduct. As *Amfac I*, *Amfac II* and the related cases demonstrate, this is not consistent with the purpose of the "course of litigation" exception.

## 2. Application of the Discovery Rule

¶ 30 Having determined that Hirsch's alleged negligence occurred outside of the context of litigation, we must apply the discovery rule and determine (a) when the "actionable negligence exist[ed]" and (b) when Cannon " 'discover[ed] or by the exercise of reasonable diligence should have discovered that [she] ha[d] been injured by [the] defendant's negligent conduct.' " *Commercial Union Ins. Co.*, 183 Ariz. at 254, 902 P.2d at 1358 (quoting *Lawhon v. L.B.J. Institutional Supply, Inc.*, 159 Ariz. 179, 183, 765 P.2d 1003, 1007 (App.1988)).

### a. When the Negligence Existed

¶ 31 Actionable negligence exists when the client "has sustained appreciable, non-speculative harm or damage as a result of such malpractice." *Id.* at 252, 902 P.2d at 1356; *Reed v. Mitchell & Timbanard, P.C.*, 183 Ariz. 313, 317, 903 P.2d 621, 625 (App. 1995) (stating that a claim for legal malpractice accrues when the "plaintiff's damages are ascertainable, and not speculative or contingent"). The trial court determined that Hirsch's alleged negligence occurred when the auction and sale of the printing equipment was completed. On appeal, Cannon argues:

The Trial Court focused on the auction as the only incidence of potential malpractice and negligence. Hirsch['s] representation of [her] did not begin with nor did it conclude with the auction. As the evidence indicates there were multiple potential acts of malpractice and negligence committed by Hirsch throughout the litigation and continuing after the auction until the Debtors were Discharged from the Bankruptcy on January 4, 2005.

Cannon contends that Hirsch committed negligence after November 2004 by failing to file a complaint objecting to the discharge of debtors by the court-imposed deadline (December 27, 2004). She asserts that, as a bankruptcy specialist, Hirsch "should have known this was his last opportunity to stop

the Debtors from being Discharged from [Cannon's] claim."

¶ 32 In his responsive brief, Hirsch acknowledges that "[g]iving Ms. Cannon the most generous view of the record, she might have argued that Hirsch was negligent on, at the latest, December 27, 2004 when he failed to file a complaint objecting to the Vaughns' discharge."

■ ¶ 33 Upon review, we agree that the facts, when viewed in the light most favorable to Cannon, support the theory that Cannon's damages became non-speculative and non-contingent on December 27, 2004, because they could have been cured or reversed before that date.[4] *See Tullar,* 168 Ariz. at 579, 816 P.2d at 236; *see also* Ronald E. Mallon & Jeffrey M. Smith, 3 Legal Malpractice § 23:18 (2008) (stating that the problem in determining the date of the malpractice "arises when the wrongful conduct is an omission" and that "[t]he latest possible date of an attorney's omission is when the negligence and damage become irreversible"). Missing the December 27, 2004 deadline to file an objection to discharge was tantamount to failing to file a lawsuit before the statute of limitations had run. *See In re Santos,* 112 B.R. at 1005–07. Although Hirsch had auctioned some of the equipment that served as security for Cannon's loan to the Vaughns, and Cannon knew about this sale on November 4, 2004, there was still an opportunity for Hirsch to recover the entire loan amount by filing an objection to discharge and alleging that the Vaughns had committed fraud by making pre-bankruptcy transfers of assets

and false statements in their bankruptcy filings. Therefore, the December 27, 2004 filing deadline was the moment "negligence existed" because it was the last moment in time Hirsch could have prevented the discharge of the Vaughns' debts.[5] *See Commercial Union Ins. Co.,* 183 Ariz. at 254, 902 P.2d at 1358 (using the terms "irremedial" and "irrevocable" to describe the "actual and appreciable" harm a client must sustain before a malpractice cause of action accrues); *see also* Mallon & Smith, *supra* ¶ 30, § 23:18 ("Negligent omissions ... often involve the failure to comply with a statutory period. The courts generally agree that an attorney's liability for failing to file within a statutory limitation arises when the client's action is proscribed."); *cf. Keonjian,* 216 Ariz. at 566, ¶ 12, 169 P.3d at 930 (holding that the accrual date did not toll when "there was no prospect that the '[a]pparent damage may vanish' " (quoting *Amfac,* 138 Ariz. at 156, 673 P.2d at 796)). We now turn to the issue of when Cannon knew or should have known that Hirsch failed to file by December 27, 2004.

### b. When Cannon Discovered or Reasonably Should Have Discovered the Negligence

■ ¶ 34 "[U]nder Arizona law, the question of when [a client] knew or should have known of [an attorney's] negligence is critical to determining whether the statute of limitations has run." *Long v. Buckley,* 129 Ariz. 141, 143, 629 P.2d 557, 559 (App.1981). Under the discovery rule, "[a] plaintiff need

---

4. The following facts support Cannon's theory that Hirsch could have remedied the harm by filing an objection to discharge on December 27, 2004:

   1. Cannon retained Hirsch to "represent her as a Secured Creditor in a Chapter 13 Bankruptcy Case," "represent [her] at a Meeting of Creditors," and "represent [her] on the Deadline to Object."

   2. Cannon had a colorable claim that the Vaughns committed fraud by selling some of the equipment prior to the bankruptcy proceedings, and the last opportunity to file a claim against the Vaughns for their alleged fraud was December 27, 2004.

   3. The attorney-client relationship between Cannon and Hirsch continued beyond the November 4, 2004 phone conversation, as evidenced by billing records showing that Hirsch

performed services on Cannon's behalf late into the month of November.

5. Cannon further asserts that she did not suffer ascertainable harm until the Vaughns received their notice of discharge on January 4, 2005, because "Hirsch could have prevented the Discharge of Debtors, at any time, prior to January 4, 2005." Cannon is mistaken in this assertion. As noted above, missing the deadline to file an objection to discharge on December 27, 2004, is analogous to failing to file a lawsuit before the statute of limitations had run. This deadline is "strictly enforced," *In re Walgamuth,* 144 B.R. at 467; thus, Hirsch could not have done anything to prevent the discharge of the Vaughns' debts between December 27, 2004, and January 4, 2005.

not know *all* the facts underlying a cause of action to trigger accrual[,][b]ut the plaintiff must at least possess a minimum requisite of knowledge sufficient to identify that a wrong occurred and caused injury." *Doe v. Roe*, 191 Ariz. 313, 323, ¶ 32, 955 P.2d 951, 961 (1998) (citation omitted). However, "the discovery issue itself involves questions of reasonableness and knowledge, matters which this court is particularly wary of deciding as a matter of law." *Long*, 129 Ariz. at 144, 629 P.2d at 560.

¶ 35 The record before us is virtually silent as to when Cannon knew or should have known that Hirsch failed to file an objection on December 27, 2004. Hirsch stated that Cannon never telephoned him after the November 4, 2004 phone conversation to inquire about the sale proceeds, and the record is silent as to any other contact between the two parties during that time period. The bankruptcy court issued a notice of discharge on January 4, 2005, but there is no evidence regarding when Cannon found out about this discharge. There is also no evidence that the attorney-client relationship was terminated by either party before January 4, 2005.

¶ 36 On this factual record there is certainly not a sufficient basis to conclude as a matter of law that Cannon knew or should have known before January 4, 2005, of Hirsch's failure to file an objection on December 27, 2004. *See Hourani v. Benson Hosp.*, 211 Ariz. 427, 432, ¶ 13, 122 P.3d 6, 11 (App.2005) ("We review a trial court's grant of summary judgment de novo, viewing the facts and reasonable inferences therefrom in the light most favorable to the nonmoving party."). Accordingly, summary judgment was not proper in this case based on the present record. *See Long*, 129 Ariz. at 143–44, 629 P.2d at 559–60 (holding that genuine issues of material fact on the issue of when the clients discovered facts giving rise to their legal malpractice action precluded summary judgment in favor of an attorney who failed to file a lawsuit before the expiration of the applicable statute of limitations).

*Conclusion*

¶ 37 For the reasons stated above, we reverse the entry of summary judgment and remand for further proceedings.[6]

CONCURRING: SHELDON H. WEISBERG, Presiding Judge.

GEMMILL, Judge, concurring.

¶ 38 I agree that the summary judgment in favor of Hirsch should be reversed and this case remanded for further factual development regarding the application of the statute of limitations, and I therefore concur generally with the result reached by my colleagues in the majority. I do not subscribe to the entirety of the majority's reasoning, however, because I believe that the bankruptcy proceeding in which Hirsch represented Cannon constituted "litigation" for purposes of applying the extended discovery rule set forth in *Amfac I* and *II*. Because the trial court in my view erred in concluding that the alleged malpractice did not occur "during the course of litigation," I would remand for further proceedings including application of accrual principles from *Amfac*. *See Amfac I*, 138 Ariz. at 156, 673 P.2d at 796 ("a cause of action for legal malpractice occurring in the course of litigation accrues when the plaintiff knew or should reasonably have known of the malpractice and when the plaintiff's damages are certain and not contingent upon the outcome of an appeal"), *approved as supplemented, Amfac II*, 138 Ariz. at 153, 673 P.2d at 793; *see also Amfac II*, 138 Ariz. at 154, 673 P.2d at 794 (explaining that the "injury or damaging effect on the unsuccessful party is not ascertainable until the appellate process is completed or is waived by a failure to appeal").

¶ 39 Whether a particular legal proceeding constitutes "litigation" for the purposes of the statute of limitations should not be decided on the basis of a hypertechnical analysis. *See Associated Aviation Underwriters v. Wood*, 209 Ariz. 137, 179, ¶ 147, 98 P.3d 572, 614 (App.2004) ("Arizona courts disfavor hypertechnical arguments") (quoting *Guinn v. Schweitzer*, 190 Ariz. 116, 119, 945 P.2d 837,

**6.** Because of our disposition of the appeal, we deny Hirsch's request for sanctions against Cannon, pursuant to Rule 11, Arizona Rules of Civil Procedure.

840 (App.1997)). Although this bankruptcy proceeding may not have been "adversarial" within the technical meaning of bankruptcy law and procedure, nonetheless it should be considered "litigation" for statute of limitations purposes. One respected dictionary defines "litigate" as "[t]o subject (something) to legal proceedings" and "litigation" as "[l]egal action or process." The American Heritage Dictionary of the English Language 763 (1970). Here, the parties were represented by attorneys; the attorneys filed papers on behalf of their clients at a courthouse; and the parties' interests were often adverse even though not technically classified as "adversarial" within the parlance of bankruptcy court.

¶ 40 Resolution of disputes on the merits is favored. *Morgan v. Carillon Invs., Inc.*, 207 Ariz. 547, 552, ¶ 26, 88 P.3d 1159, 1164 (App. 2004), *aff'd*, 210 Ariz. 187, 109 P.3d 82 (2005); *see also Montano v. Browning*, 202 Ariz. 544, 546, ¶ 4, 48 P.3d 494, 496 (App.2002). But dismissal based on a statute of limitation defense is not favored. *See Morgan*, 207 Ariz. at 552, ¶ 26, 88 P.3d at 1164.

¶ 41 For these reasons, I concur in reversing the summary judgment and remanding this case to the trial court for further factual development regarding the potential application of the statute of limitations and for any additional proceedings that may be appropriate.